**SUNRAY OIL CORPORATION, Appellant,
v. G. T. ALLBRITTON, Appellee.**

No. 13148.

United States Court of Appeals.
Fifth Circuit.

April 26, 1951.

For former opinion, see 187 F.2d 475.

Philip Brin, Longview, Tex., C. E. Bryson, Houston, Tex., Edward Howell, Oklahoma City, Okl., Angus G. Wynne, Longview, Tex., and Gene M. Woodfin, and Ben H. Rice, III, Houston, Tex., for appellant.

J. Edwin Smith and George E. Cire, Houston, Tex., for appellee.

Before HUTCHESON, Chief Judge, and HOLMES, McCORD, BORAH and RUSSEL, Circuit Judges.

PER CURIAM.

It is ordered that the petition for rehearing in the above entitled and numbered cause be, and it is hereby denied.

HOLMES and McCORD, Circuit Judges, dissenting.

HUTCHESON, Chief Judge (concurring).

While I concur fully in the order overruling the motion for rehearing, in view of the statement in appellant's motion that the failure of the Court to state its views on the issue of the claimed excessiveness of the verdict has left them in doubt as to their proper course, I have concluded to briefly state my own views.

1. The action of the district judge in refusing to relieve against the verdict as excessive is, unreviewable by this court if the verdict is excessive only in fact, reviewable if it is excessive in law.

2 Whether, in the opinion of the district judge, a verdict is excessive as matter of fact, that is, though not contrary to right reason and, therefore not excessive as matter of law, it is larger in amount than the judge thinks it justly ought to be, or is excessive as matter of law, that is, is so monstrous [1] or inordinate [2] in amount as to find no support in right reason,[3] he has the same power, the same duty, in the one case as in the other to relieve against the excessiveness by granting a new trial or requiring a remittitur in lieu.

3. The power and duty, on the other hand, of the Court of Appeals to relieve against excessiveness in verdicts does not extend to cases where the verdict is excessive merely as matter of fact. Limited as it is by the Seventh Amendment, its power and duty extend only to cases in which the verdict is excessive as matter of law, that is, is so gross or inordinate in amount as to be contrary to right reason.

In such cases the Court of Appeals has the power, and it is its duty, to relieve against excessiveness in law either by reversing the judgment for the error in law of the trial judge in abusing his discretion by not relieving against it, or by requiring a remittitur in lieu of reversal.

In this case I was, and am, of the clear opinion that the verdict is not gross, monstrous, or inodinate, and, therefore, contrary to right reason, and if it is excessive it is not so as matter of law but only as matter of fact. This being so, I was, and am, of the opinion that this court is without power, it has no duty or function, to inquire into

1. Virginia Railway Co. v. Armentrout, 4 Cir., 166 F.2d 400, 4 A.L.R.2d 1064; Affolder v. N. Y., 339 U.S. 96, 70 S.Ct. 509, 94 L.Ed. 683; Barry v. Edmunds, 116 U.S. 550, 6 S.Ct. 501, 29 L.Ed. 729; So. Pac. v. Guthrie, 9 Cir., 180 F.2d 295; on rehearing, 9 Cir., 186 F.2d 926; But see, contra, St. Louis, S. W. Ry. Co. v. Ferguson, 8 Cir., 182 F.2d 949.

2. Crowell-Collier v. Caldwell, 5 Cir., 170 F. 2d 941.

3. Law and Fact in Insurance Cases, Texas Law Review, Dec., 1944, at pp. 4, 5, and 6; Reid v. Maryland Cas. Co., 5 Cir., 63 F.2d 10; Quanah A. & P. R. Co. v. Gray, 5 Cir., 63 F.2d 410; Howard v. Louisiana & R. Co., 5 Cir., 49 F.2d 571; Chamberlayne, "The Modern Law of Evidence," Secs. 120(a), 122, 145, 148 and 149.

the amount of its excessiveness as matter of fact, none to reverse for, or otherwise relieve against, the excessiveness, if any, as matter of fact, in the verdict.

In agreeing, therefore, to affirm the judgment against the attack upon it of the excessiveness of the verdict, I did so without at all intending either to approve or disapprove the amount of the verdict or to consider or determine whether it was or was not excessive as matter of fact or whether it should or should not have been relieved against by the district judge in the exercise of his undoubted power and his equally undoubted duty[4] to relieve against such excessiveness, if, in his judgment, it was excessive in fact, that is, was larger in amount than he thought it justly ought to be.

HOLMES, Circuit Judge (dissenting).

The majority opinion did not discuss the constitutional question in this case, or the factual issue as to the amount of the verdict being manifestly excessive; but often what a court does is more important than what it says. Sometimes what the courts do speak so loudly that we cannot hear what they say, but that is not what happened here. Obviously, this court determined either that the moderated verdict was not manifestly excessive or that it had no constitutional power to examine the question. Either holding was prejudicially erroneous, the latter for reasons already fully discussed in the dissent, the former for reasons presently to be stated.

The court expressly held that the verdict for $125,000 was infected with error, and lopped therefrom the sum of $13,084.70 without calling on the appellee for a remittitur of that amount. This reduced the verdict and judgment to $111,915.30, which the court let stand. This judicial action necessarily implied a determination that the reduced amount was not manifestly excessive or that, as an appellate federal court, it had no constitutional authority to disturb the modified verdict or to call upon

the appellee to remit the excessive portion thereof.

It is generally conceded, though with some play upon words, that federal appellate courts have the power to re-examine any fact tried by jury, for the purpose of ascertaining whether the trial court abused its discretion in denying a new trial. In Crowell-Collier Pub. Co. v. Caldwell, 5 Cir., 170 F.2d 941, at page 944, this court said: "If the verdict in this case were merely excessive in respect both of actual and punitive damages and in respect of the relation between the two, these facts standing alone would not constitute reversible error. But the verdict here was not merely in the ordinary sense an excessive verdict. It was an inordinate one, without precedent or sound legal basis."

In the recent case of Commercial Credit Co. v. Pepper, 5 Cir., 187 F.2d 71, 75, which was tried by a jury but did not involve excessive damages, this court asserted its jurisdiction to review the trial court's ruling upon the motion for a new trial, and reversed the judgment of the district court on the ground that it abused its discretion in refusing to grant a new trial. The court said: "Under the circumstances presented, and quite independent of the error in the charge, we are of opinion that the trial court erred in denying plaintiff's motion for a new trial. It is a principle well recognized in the federal courts that the granting or refusing of a new trial is a matter resting within the discretion of the trial court. The term 'discretion', however, when invoked as a guide to judicial action, means a sound discretion, exercised with regard to what is right and in the interests of justice. And an appellate court is not bound to stay its hand and place its stamp of approval on a case when it feels that injustice may result. Quite to the contrary, it is definitely recognized in numerous decisions that an abuse of discretion is an exception to the rule that the granting or refusing of a new trial is not assignable as error." Citing Langnes v. Green, 282 U.S. 531, 51 S.Ct. 243, 75 L.Ed. 520, and

4. Cobb v. Lepisto, 9 Cir., 6 F.2d 128; Virginia Ry. Co. v. Armentrout, 4 Cir., 166 F.2d 408, 4 A.L.R.2d 1064; Southern Pacific v. Guthrie, 9 Cir., 186 F.2d 926, at page 933 and note 11; Reid v. Maryland Cas. Co., 5 Cir., 63 F.2d 10, at p. 12.

Virginian Ry. Co. v. Armentrout, 4 Cir., 166 F.2d 400, 4 A.L.R.2d 1064.

In the Virginian Railway case, 166 F.2d, at pages 407–409, the court said: "The problem of assessing damages in a case of this sort is one which must be approached with common sense. * * *

"The power and duty of the trial judge to set aside the verdict under such circumstances is well established, the exercise of the power being regarded as not in derogation of the right of trial by jury but one of the historic safeguards of that right. * * *

"The power of this court to reverse the trial court for failure to exercise the power, where such failure, as here, amounts to an abuse of discretion, is likewise clear. * *

"That abuse of discretion in refusing to set aside a verdict is an exception to the rule that the granting or refusing of a new trial is not assignable as error, is definitely recognized in the following decisions: [Citing them]."

Thus it is apparent that any fact tried by a jury may be re-examined by an appellate federal court for the purpose of ascertaining whether the trial court abused its discretion in refusing to grant a new trial because the jury had abused their discretion in rendering a verdict for manifestly excessive damages. It is also apparent that at common law there was no such circuity of judicial review of a fact tried by jury when they had abused their discretion in rendering a manifestly excessive verdict. The King's Bench, in the exertion of its superintendent powers, re-examined the facts to determine whether the jury had been guilty of an abuse of discretion, apprehending with reason that rendering a verdict for manifestly excessive damages was a principal species of misbehavior by jurors. Lewis' Blackstone, p. 1347 et seq. By Sec. 22 of the Judiciary Act of 1789, federal appellate courts were forbidden to do this; but by Sec. 2106 of the Judiciary Code of 1948, 28 U.S.C.A. they were required to do it, since the 7th Amendment impliedly authorizes the re-examination of any fact tried by a jury except otherwise than in accordance with the rules of the common law. The procedure of striking at the jurors' misbehavior over the shoulders of the trial judge was devised to prevent injustice because of the statutory restriction on appellate power. The old statute having been superseded, the reason for the device has ceased.

In the instant case, the majority may have deemed the moderated verdict manifestly excessive but not to such a degree as to evince bias, prejudice, or passion, on the part of the jury. If so, it was prejudicial error for the court to affirm the judgment unless the appellee remitted the excessive portion thereof. It is also true that the majority may have deemed the moderated verdict manifestly excessive but not to such a degree as to show an abuse of discretion on the part of the trial judge in refusing to grant a new trial unless the plaintiff remitted the excessive portion. Upon the first hypothesis, the court was trying the jury, upon the second, it was trying the district judge, when it should have re-examined the facts tried by the jury, because such a re-examination would not have been "otherwise" than according to the rules of the common law.

In reducing the verdict by $13,084.70, this court did not eliminate that sum from the total amount of pecuniary damages sustained by the plaintiff, since under the law of Texas he was entitled to recover in this action only the amount due him in excess of the sum paid him by the insurance carrier. Clearly, it was within the power of this court to determine the upper limit of the permissible verdict under the evidence. This necessitated a determination of the maximum amount that the most favorable view of the evidence warranted; justice under law required a remission of the excess, and can be satisfied with nothing less. Ample power of such determination is granted this court under Section 2106, Title 28 of the United States Code.

The questions then are: were pecuniary damages for $125,000 for the injuries sustained by the plaintiff fairly warranted by any view of the substantial evidence in this case? If not, what was the maximum amount so warranted? If compensation for impaired earning power be

assumed as one element of damages, it should not be such a sum as would earn a return equal to the value of this lessened ability, leaving the principal sum intact at plaintiff's death, but should be a sum that would purchase an annuity equal to this return during the probable life of the plaintiff, calculated from reliable statistics upon the average duration of human life. Let us approach the problem from this aspect.

The appellee testified that at the time of his injury he was making about two hundred dollars every two weeks, having been given a raise in wages to $1.10 per hour. Both he and his present employer testified that at the time of the trial he was working at a filling station and making from $80 to $90 per month. If the jury accepted Allbritton's own testimony, it was their duty to award him damages sufficient to compensate him for the pain and suffering endured by him, for the necessary medical and hospital expenses incurred by him, and for an additional sum that would represent the cash value of what by reason of his injury he was deprived of earning during the remainder of his life. He was 34 years old at the time of his injury, and, according to an annuity table introduced by him, he had a life expectancy of 38.28 years, though according to the Commissioners 1941 Standard Ordinary Mortality Table, which was effective in Texas and 45 other states at this time, he had an expectancy of only 34.29 years. While he testified that he was earning $200 every two weeks, he also testified that his hourly wage had recently been raised to $1.10. Therefore, if he worked 56 hours per week, and received time and a half for those hours over 40, and double time for his Sunday work, his total pay would be only $149.60 every two weeks.

It is proper to consider a person's decreasing earning capacity as the years go by, especially one who had only a fourth-grade education and whose work was restricted to manual labor. It is difficult to believe that Allbritton, doing hard manual labor, could have worked eight hours a day, seven days a week, for the rest of his life. The Biblical standard of a six-day work-week, with the Sabbath as a day of rest, has long been proven to be the most effective economical schedule that mankind can adopt. If appellee could be expected to perform manual labor for 40 hours per week at $1.10 per hour, he would receive a total of $2288 per year. He now earns $960 per year working in a filling station, but let us disregard that on the theory that the jury may have found him to be not able to work. We cannot presume that prevailing interest rates will remain uniformly low for 34 or 38 years. Under the present judgment, if the $111,915.30 award were invested at 3%, Allbritton would receive $3357.46 a year for the rest of his life and still have his $111,915.30 at the end of 38 years.

In 13 Tex. Jur. 184, the Texas law is stated to be that the allowance should not be such sum as would yield an annual return corresponding with the annual value of his lessened ability, leaving the principal sum still belonging to the estate of the plaintiff after his death, but should be an amount that would purchase an annuity equal to his loss of earnings during his expectancy calculated upon a reliable basis as to the average duration of human life. It should also be noted that nowhere has it been taken into account that this judgment is not subject to income taxes, whereas a part of his wages would have been, and a substantial portion of the same might have been used to pay taxes, especially as the years progressed and his dependents became self-supporting. According to the Commissioners 1941 Standard Ordinary Mortality Table, $63,096.18 would purchase for a man 34 years of age an annuity that would pay him $2288 for life, only the earned-interest portion of which would be subject to income taxes. If to this amount we add $10,000 for pain and suffering, plus $6500 for hospital and medical bills, we have $79,596.18, which would leave the verdict manifestly excessive (inordinately excessive if you please).

Another view of the award is this: If the $111,915.30 allowed by the majority opinion were invested at 2½%, Allbritton would receive $2797.88 annually for the rest of his life, and leave intact at his death the full amount originally received. This year-

ly income of $2797.88 is $509.88 more than the previously mentioned $2288 that Allbritton might make if he worked 40 hours per week for the rest of his life. This is clearly against the Texas law as above set forth in 13 Tex.Jur. 184.

There is a serious conflict within this circuit, and among the various circuits, as to the correct legal approach by an appellate federal court to the question of excessive damages in personal-injury litigation. This case was argued and submitted to a court of three judges on May 17, 1950; it was re-argued and re-submitted to the court en banc on November 17, 1950, and decided on February 15, 1951. Did the court fail to exercise fully the appellate jurisdiction granted it under Sec. 2106, Title 28 of the U.S. Code? Did the majority agree on the legal and constitutional principles applicable to the issue of manifestly excessive damages? Was there agreement as to the rules of the common law according to which the facts in evidence might be re-examined? Did the court re-examine the facts as permitted by the 7th Amendment, or examine the discretion of the trial judge to see if it was abused as some of the cases indicate is the rule? Did it re-examine the facts to ascertain whether the verdict was manifestly excessive, or whether the jury was actuated by bias, passion, or prejudice, in rendering a manifestly excessive verdict? Did the court, as has so often been held, deem itself without jurisdiction to call on the plaintiff for a remittitur or to order a reversal for any error of fact committed by the jury in awarding merely manifestly excessive damages?

These and other questions crowd upon us and remain unanswered. It may be that the decision of the issue as to excessive damages in this case turned upon the correct or incorrect approach of the individual judges to the question. Were they approaching the problem unfettered, like the judges of the Court of King's Bench in 1791 in superintending the courts of *nisi prius,* or did they deem themselves restrained from so doing by a constitutional provision? The statutory provision against reversals in jury cases for any error in fact remained on the books for 159 years; and, during that period, the federal courts lost the use of an ancient common-law appellate power. This power, in our opinion, may be compared to an arm that has become atrophied; even legislation like said Sec. 2106 cannot fully restore it; only a decision of the Supreme Court can cure it completely.

Finally, it cannot be denied that the procedural common law of England on the 15th of December, 1791, was in a state of flux. In 1766, Lord Mansfield said that he had no doubt but that it might be right to give an opportunity of reconsidering a verdict where excessive damages had been given, but that the present case did not dissatisfy him. 3 Burr.1846 (KB), 97 Eng.Rep. 1130. The reporter, Burrow, says: "Mr. Justice Ashton concurred. He was very full in vindicating the discretion of the court to grant new trials even when the damages were ideal: and cited the case of Wood v. Gunston" (By ideal are meant those damages not capable of exact ascertainment, like pain and suffering. Beardmore v. Carrington (1764), 2 Wils 244). In 1786, in Ducker v. Wood, in King's Bench, 1 Term Reports 277, 99 Eng.Rep. 1092, Lord Mansfield said that there was no doubt but that the court had the power to take the opinion of a second jury in any case where the damages were excessive; yet in 1792 the court reverted to the strict view. In the case of Duberley v. Gunning, May 8, 1792, 4 Term Reports 652, 100 Eng.Rep. 1226, the court refused to grant a new trial on the ground of excessiveness of damages, stating that it could not be done. Justice Ashton dissented. Perhaps the case may be explained on the ground of the nature of the action, because the same court, on May 7, 1793 (both decisions by Lord Kenyon), pointed out that the court was not unanimous in the Duberley case, which it said was *sui generis.* The court then proceeded to grant a new trial in an assault and battery case in which damages were excessive. Jones v. Sparrow (1793) 5 Term Reports 257, 101 Eng.Rep. 144.

Chitty, in his work on Blackstone (Vol. 3, p. 306) footnotes Blackstone's statement with "for excessive damages indicating passion or prejudice." Chitty's statement is supported by Beardmore v. Carrington (1764), 2 Wils 244, but from the statement in Book III, page 388, of his Commentaries,

it does not appear that Blackstone so interpreted the case of Wood v. Gunston, nor did Lord Mansfield. All of this points to the correctness of the following statement in Galloway v. United States, 319 U.S. 372, beginning at page 390, 63 S.Ct. 1077, at page 1087, 87 L.Ed. 1458:

"The Amendment did not bind the federal courts to the exact procedural incidents or details of jury trial according to the common law in 1791, any more than it tied them to the common-law system of pleading or the specific rules of evidence then prevailing. Nor were 'the rules of the common law' then prevelant, including those relating to the procedure by which the judge regulated the jury's role on questions of fact, crystalized in a fixed and immutable system. On the contrary, they were constantly changing and developing during the late eighteenth and early nineteenth centuries. In 1791 this process already had resulted in widely divergent common-law rules on procedural matters among the states, and between them and England. And none of the contemporaneous rules regarding judicial control of the evidence going to juries or its sufficiency to support a verdict had reached any precise, much less final, form. In addition, the passage of time has obscured much of the procedure which then may have had more or less definite form, even for historical purposes.

"This difficulty, no doubt, accounts for the amorphous character of the objection now advanced, which insists, not that any single one of the features criticized, but that the cumulative total or the alternative effect of all, was embodied in the Amendment. The more logical conclusion, we think, and the one which both history and the previous decisions here support, is that the Amendment was designed to preserve the basic institution of jury trial in only its most fundamental elements, not the great mass of procedural forms and details, varying even then so widely among common-law jurisdictions."

See Southern Pacific Co. v. Guthrie, 9 Cir., 186 F.2d 926, decided Jan. 15, 1951, by the Ninth Circuit, en banc, which has come to our attention since this dissent was written, and wherein the court said, in note 11 of its opinion, that the victim of an excessive verdict, not the result of passion or prejudice, and not monstrous or grossly excessive, is entitled to relief at the hands of the trial judge; and that the power of the judge to grant such relief is an essential part of trial by jury under our system. To this let us add the following: Under Section 2106 of New Title 28 U.S.Code, what was said by the Supreme Court in Capital Traction Co. v. Hof, 174 U.S. 1, 13, 19 S. Ct. 580, 585, 43 L.Ed. 873, with reference to the power of trial courts to set aside verdicts and grant new trials, now applies to appellate federal courts, viz: " 'Trial by jury,' in the primary and usual sense of the term at the common law and in the American constitutions, is not merely a trial by a jury of 12 men before an officer vested with authority to cause them to be summoned and empaneled, to administer oaths to them and to the constable in charge, and to enter judgment and issue execution on their verdict; but it is a trial by a jury of 12 men, in the presence and under the superintendence of a judge empowered to instruct them on the law and to advise them on the facts, and (except on acquittal of a criminal charge) to set aside their verdict, if, in his opinion, it is against the law or the evidence."

So far as they affected jury trials, six little words in the Judiciary Act of 1789 [1] survived the vicissitudes of many legislative changes, and for over a century and a half escaped the sickle of revisors, codifiers, rule makers, and law makers, but finally they succumbed to the deft touch of the 1948 codifiers in their "Schedule of Laws Repealed": and all the king's horses and all the king's men cannot put them back again in their little niche without an Act of Congress; but the Seventh Amendment remains intact, and champions of the jury system have nothing to fear if the federal courts will adhere to the essential principles of trial by jury at common law, in 1791, as required by said Amendment.

McCORD, Circuit Judge, concurs.

---

[1]. "Or for any error in fact." 28 U.S.C. § 879, R.S. § 1011, 18 Stat. 318.